CITY NEWS & NOVELTY, INC., Plaintiff-Appellant,†

v.

CITY OF WAUKESHA, Defendant-Respondent.

Court of Appeals

*No. 97–1504. Oral argument April 13, 1999.—Decided October 20, 1999.*

(Also reported in 604 N.W.2d 870.)

†Petition to review denied.

94

On behalf of the plaintiff-appellant, there were briefs and oral arguments by *Jeff Scott Olson* of Madison.

On behalf of the defendant-respondent, there was a brief by *Curt R. Meitz*, city attorney, and *Julie M. Gay*, assistant city attorney. There were oral arguments by *Curt R. Meitz*, city attorney.

Before Nettesheim, Anderson and Snyder, JJ.

¶ 1. SNYDER, J. City News and Novelty, Inc. (City News) appeals from a circuit court judgment affirming the City of Waukesha's (the City) decision not to renew City News's license to operate an adult-oriented establishment. City News raises the following issues on appeal. First, it contends that the City's adult establishment licensing scheme is unconstitutional because it fails to offer explicit standards for license renewal, provides inadequate time limits for judicial review, fails to preserve the status quo throughout the administrative process and does not permit prompt judicial review. Second, City News raises due process arguments claiming that it was deprived of an impartial administrative review, that it was given inadequate notice of the allegations against it and that the City improperly invoked the most severe sanction of nonrenewal. Finally, it contends that the grounds for nonrenewal were insufficient as a matter of law.[1]

---

[1] We certified the issues of preservation of the status quo, prompt judicial review and imposition of the most severe municipal sanction to the supreme court. *See* RULE 809.61, STATS. The supreme court, however, declined to take the case.

97

¶ 2. While we find City News's arguments unavailing in large part, we conclude that § 8.195(3)(d) of the CITY OF WAUKESHA, WIS., MUNICIPAL CODE (1995) (hereinafter MUNICIPAL CODE), providing an applicant the right to a public hearing, is constitutionally infirm. However, because the public hearing provision of § 8.195(3)(d) is severable from the remainder of the ordinance, we reverse as to this provision and affirm as to the remainder.

## BACKGROUND

¶ 3. City News is an adult-oriented establishment in the city of Waukesha which sells, rents and otherwise makes available to its customers sexually explicit books, magazines, videotapes and other materials. It also provides viewing booths in which its customers may view videotapes.

¶ 4. City News is licensed annually under the provisions of § 8.195 of the MUNICIPAL CODE.[2] Licensure

---

[2] The pertinent provisions of CITY OF WAUKESHA, WIS., MUNICIPAL CODE § 8.195 (1995), include the following:

> (2) LICENSE. (a) [N]o adult oriented establishment shall be operated or maintained in the City without first obtaining a license to operate issued by the City.
> . . . .
> (3) · APPLICATION FOR LICENSE. (a) Any person desiring to secure a license shall make application to the City Clerk. . . .
> . . . .
>> (c) Within 21 days of receiving an application for a license, the City Clerk shall notify the applicant whether the application is granted or denied.
>> (d) Whenever an application is denied, the City Clerk shall advise the applicant in writing of the reasons for such action. If the applicant requests a hearing within 10 days of receipt of notification of denial, a public hearing shall be held within 10 days thereafter before the Council or its designated committee as hereinafter provided.

is required for an individual or a corporation to operate or maintain an adult-oriented establishment. *See id.*

. . . .

(4) STANDARDS FOR ISSUANCE OF LICENSE. To receive a license to operate an adult oriented establishment, an applicant must meet the following standards:

. . . .

(b) If the applicant is a corporation:

1. All officers, directors, and stockholders required to be named under par. (3)(b) shall be at least 18 years of age.

2. No officer, director, or stockholder required to be named under par. (3)(b) shall have been found to have previously violated this section within 5 years immediately preceding the date of the application.

. . . .

(7) RENEWAL OF LICENSE OR PERMIT. (a) Every license issued pursuant to this section will terminate at the expiration of one year from date of issuance, unless sooner revoked and must be renewed before operation is allowed in the following year. Any operator desiring to renew a license shall make application to the City Clerk. The application for renewal must be filed not later than 60 days before the license expires. The application for renewal shall be upon a form provided by the City Clerk and shall contain such information and data given under oath or affirmation as is required for an application for a new license.

. . . .

(c) If the City Police Department is aware of any information bearing on the operator's qualifications, that information shall be filed in writing with the City Clerk.

(d) The building inspector shall inspect the establishment prior to the renewal of a license to determine compliance with the provisions of this ordinance.

. . . .

(9) PHYSICAL LAYOUT OF ADULT ORIENTED ESTABLISHMENT. Any adult oriented establishment having available for customers, patrons or members, any booth, room or cubicle for the private viewing of any adult entertainment must comply with the following requirements:

(a) Access. Each booth, room or cubicle shall be totally accessible to and from aisles and public areas of the adult

oriented establishment and shall be unobstructed by any door, lock or other control-type devices.

(b) <u>Construction</u>. Every booth, room or cubicle shall meet the following construction requirements:

1. Each booth, room or cubicle shall be separated from adjacent booths, rooms or cubicles and any non-public areas by a wall.

2. Have at least one side totally open to a public lighted aisle so that there is an unobstructed view at all times of anyone occupying the same.

. . . .

(c) <u>Occupants</u>. Only one individual shall occupy a booth, room or cubicle at any time. No occupants of same shall engage in any type of sexual activity, cause any bodily discharge or litter while in the booth. No individual shall damage or deface any portion of the booth.

(d) <u>Inspections</u>. The Building Inspector shall conduct monthly inspections of the premises to insure compliance with the provisions of this subsection.

(10) RESPONSIBILITIES OF THE OPERATOR. (a) Every act or omission by an employee constituting a violation of the provisions of this Section shall be deemed the act or omission of the operator if such act or omission occurs either with the authorization, knowledge, or approval of the operator, or as a result of the operator's negligent failure to supervise the employee's conduct, and the operator shall be punishable for such act or omission in the same manner as if the operator committed the act or caused the omission.

(b) Any act or omission of any employee constituting a violation of the provisions of this section shall be deemed the act or omission of the operator for purposes of determining whether the operator's license shall be revoked, suspended or renewed.

(c) No employee of an adult oriented establishment shall allow any minor to loiter around or to frequent an adult oriented establishment or to allow any minor to view adult entertainment as defined herein.

. . . .

cant whether the application is granted or denied within twenty-one days of the application's receipt. *See id.* § 8.195(3)(c).

¶ 5. For a corporate applicant, the licensure standards state that no officer, director or stockholder "shall have been found to have previously violated this section within 5 years immediately preceding the date of the application." *Id.* § 8.195(4)(b)2. The ordinance then sets forth specific requirements for the physical layout and the conduct of patrons and employees of the establishment which, among other things, provide that: (1) every viewing booth or room must have at least one side entirely open to the public,[3] (2) no patron may engage in any type of sexual activity, and (3) no employee may permit a minor to loiter around or patronize the establishment. *See id.* § 8.195(9)(b)2, (9)(c), (10)(c).

¶ 6. On November 15, 1995, City News applied for renewal of its license which was due to expire on January 25, 1996. On December 19, 1995, the common council passed a resolution finding that City News had committed several code violations and therefore denied its renewal application. The violations included per-

(f) The operator shall insure compliance of the establishment and its patrons with the provisions of this section.

(11) ADMINISTRATIVE REVIEW PROCEDURE. The City ordinances and State law shall govern the administrative procedure and review regarding the granting, denial, renewal, nonrenewal, revocation or suspension of a license.

[3] City News has previously challenged the City's open booth policy. In *City News & Novelty, Inc. v. City of Waukesha*, 170 Wis. 2d 14, 23, 487 N.W.2d 316, 319 (Ct. App. 1992), we upheld the ordinance by concluding that City News's patrons did not have a protected First Amendment right to privacy in viewing sexual materials in a public setting.

101

mitting minors to loiter on the premises, failing to maintain an unobstructed view of the viewing booths and allowing patrons to engage in sexual conduct inside the booths.

¶ 7. After City News requested review of the resolution, the common council affirmed the decision. City News sought administrative review, and on June 28, 1996, the City of Waukesha Administrative Review Appeals Board affirmed the common council's decision. City News then filed a certiorari action in the circuit court seeking judicial review of the denial of its license renewal application. In an April 2, 1997 decision, the circuit court affirmed the board's determination. City News appeals.[4]

## STANDARD OF REVIEW

¶ 8. In an action for certiorari review, appellate review is the same as in the trial court. *See State ex rel. Wilson v. Schocker*, 142 Wis. 2d 179, 183, 418 N.W.2d 8, 9 (Ct. App. 1987). We confine our review to whether: (1) the board kept within its jurisdiction; (2) the board acted according to the law; (3) the action was arbitrary,

---

[4] We note that in *Suburban Video, Inc. v. City of Delafield*, 694 F. Supp. 585 (E.D. Wis. 1988), the District Court for the Eastern District of Wisconsin addressed the constitutionality of a licensing scheme identical in relevant part to the City of Waukesha's. There, the court found the City of Delafield's ordinance constitutional except for a provision requiring disclosure of an applicant's detailed personal information. *See id.* at 592. While the court did not specifically address the issues raised here, we nevertheless remark that the licensing scheme was upheld as being narrowly tailored and furthering a substantial governmental purpose. *See id.* at 589 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)).

oppressive or unreasonable; and (4) the evidence presented was such that the board might reasonably make the order or determination in question. *See State v. Goulette*, 65 Wis. 2d 207, 215, 222 N.W.2d 622, 626 (1974). The primary issues raised in this case involve constitutional questions and questions of statutory construction which are questions of law that we review de novo. *See City of Waukesha v. Town Bd.*, 198 Wis. 2d 592, 601, 543 N.W.2d 515, 518 (Ct. App. 1995); *State v. Migliorino*, 150 Wis. 2d 513, 524, 442 N.W.2d 36, 41 (1989).

## DISCUSSION

### A. First Amendment Protections

¶ 9. City News raises a number of facial challenges to the constitutionality of the City's licensing scheme. "Although facial challenges to legislation are generally disfavored, they have been permitted in the First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990).

¶ 10. *FW/PBS* is the United States Supreme Court's most recent articulation of the constitutional principles that apply to municipal licensing schemes implicating First Amendment rights. The Court held that a licensing scheme that exists as a prior restraint on businesses purveying sexually explicit but protected speech is constitutionally permissible if it contains safeguards to minimize the possibility that the licensing procedure will be used to suppress speech. *See id.* at 226. The Court then set forth several requirements that licensing ordinances must follow to pass constitu-

tional scrutiny. First, the regulatory scheme cannot place "unbridled discretion in the hands of a government official or agency." *Id.* at 225 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)). In other words, if a permit or license may be granted or withheld solely at the discretion of a government official, this is an "unconstitutional censorship or prior restraint" upon the exercise of the freedom of speech. *See id.* at 226. Second, "a prior restraint that fails to place limits on the time within which the decisionmaker must issue the license is impermissible." *Id.* A licensing decision must be made "within a specified and reasonable time period during which the status quo is maintained." *Id.* at 228. Finally, a regulatory scheme must provide for "prompt judicial review" in the event that a license is erroneously denied. *See id.*

¶ 11. We apply the constitutional framework in *FW/PBS* to our examination of the City's licensing scheme. In doing so, we note that although ordinances normally receive a presumption of constitutionality which the challenger must refute, when the ordinance regulates First Amendment activities "the burden shifts to the government to defend the constitutionality of that regulation beyond a reasonable doubt." *County of Kenosha v. C & S Management, Inc.*, 223 Wis. 2d 373, 383, 588 N.W.2d 236, 242 (1999) (quoted source omitted). Wisconsin courts have routinely applied this burden-shifting approach in First Amendment cases. *See, e.g., id.*; *Lounge Management, Ltd. v. Town of Trenton*, 219 Wis. 2d 13, 20, 580 N.W.2d 156, 159, *cert. denied*, 119 S. Ct. 511 (1998); *Town of Wayne v. Bishop*, 210 Wis. 2d 218, 231, 565 N.W.2d 201, 206 (Ct. App. 1997). *FW/PBS*, however, rejected this approach where First Amendment prior restraints are concerned

and the government action at issue is the review of an applicant's qualifications for a business operating license. The *FW/PBS* Court explained its reasoning in the following passage, distinguishing its licensing scheme from the scheme in *Freedman v. Maryland*, 380 U.S. 51 (1965).

> The Court . . . required in *Freedman* that the censor bear the burden of going to court in order to suppress the speech and the burden of proof once in court. The licensing scheme we examine today is significantly different from the censorship scheme examined in *Freedman.* In *Freedman*, the censor engaged in direct censorship of particular expressive material. Under our First Amendment jurisprudence, such regulation of speech is presumptively invalid and, therefore, the censor in *Freedman* was required to carry the burden of going to court if the speech was to be suppressed and of justifying its decision once in court. Under the Dallas ordinance [in *FW/PBS*], the city does not exercise discretion by passing judgment on the content of any protected speech. Rather, the city reviews the general qualifications of each license applicant, a ministerial action that is not presumptively invalid. The Court in *Freedman* also placed the burdens on the censor, because otherwise the motion picture distributor was likely to be deterred from challenging the decision to suppress the speech and, therefore, the censor's decision to suppress was tantamount to complete suppression of the speech. The license applicants under the Dallas scheme have much more at stake than did the motion picture distributor considered in *Freedman*, where only one film was censored. Because the license is the key to the applicant's obtaining and maintaining a business, there is every incentive for the applicant to pursue a license denial through

court. *Because of these differences, we conclude that the First Amendment does not require that the city bear the burden of going to court to effect the denial of a license application or that it bear the burden of proof once in court.*

*FW/PBS*, 493 U.S. at 229–30 (emphasis added). The licensing ordinance at play here is the same type that was before the Court in *FW/PBS*. Both involve the ministerial act of assessing license applications; however, neither engages in direct censorship or entails the "exercise [of] discretion by passing judgment on the content of any protected speech." *Id.* at 229. Consequently, we conclude that the burden does not shift to the City to defend the ordinance's constitutionality.

### 1. *Renewal Standards*

¶ 12. City News first contends that the ordinance is unconstitutional because it fails to provide explicit standards for license renewal. This argument goes to the issue of whether the ordinance permits "unbridled discretion." Because we conclude that the ordinance contains specific guidelines for renewal, we reject City News's argument.

¶ 13. Our review begins with subsec. (7) of the ordinance, entitled "RENEWAL OF LICENSE OR PERMIT," which contains several guidelines for renewal. *See* MUNICIPAL CODE § 8.195(7). Every license terminates after one year and must be renewed before operation is permitted for the following year. *See id.* § 8.195(7)(a). The applicant for renewal must provide a $250 renewal fee, the building must be inspected prior to renewing the license and the City of Waukesha Police Department must file with the city clerk any information it finds bearing on the operator's qualifications. *See id.* § 8.195(7)(b), (c), (d). The application

"shall contain such information and data given under oath or affirmation as is required for an application for a new license." *Id.* § 8.195(7)(a). City News contends that because the subsec. (7) standards fall under the "RENEWAL" heading, these are the only guidelines that apply for renewal and that the standards found under subsec. (4), entitled "STANDARDS FOR ISSUANCE OF LICENSE," only apply to the issuance of *new* licenses. We disagree.

¶ 14. At first blush, the ordinance appears to contain discrete subsections on issuance, revocation and renewal of licenses because each of these procedures has a separate heading. However, when read as a whole, it is clear that the standards of issuance are also meant to apply to renewal. Following the subsection on renewal are provisions addressing all matters of licensing. In particular, para. (10)(b) of the subsection entitled "RESPONSIBILITIES OF THE OPERATOR" states that

> [a]ny act or omission of any employee constituting a violation of the provisions of this section shall be deemed the act or omission of the operator for purposes of determining whether the operator's license shall be revoked, suspended or *renewed*. [Emphasis added.]

Paragraph (10)(f) also provides that "[t]he operator shall insure compliance of the establishment and its patrons with *the provisions of this section*." (Emphasis added.) The phrase "the provisions of this section" comprises *all* regulations within the licensing scheme, whether falling under renewal subsec. (7) or not. As outlined earlier, the ordinance's guidelines under subsecs. (9) and (10) address the proper physical layout of the premises and the conduct of the operators, employ-

ees and patrons. City News does not dispute the adequacy of these guidelines, and we are satisfied that they provide "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). We therefore reject City News's argument that the scheme gives the City unfettered discretion to issue licenses.

¶ 15. Apart from the renewal standards, City News asserts that the ordinance is defective because it does not expressly state that a new license *must* be issued upon satisfaction of the new license standards. City News cites *Wolff v. City of Monticello*, 803 F. Supp. 1568 (D. Minn. 1992), for the proposition that a licensing scheme must direct the granting of a license when an applicant is not rendered ineligible under its standards.

¶ 16. In *Wolff*, the court reviewed a licensing ordinance for an adult-oriented establishment that instructed the city council to investigate each application and hold a public hearing. Following the hearing, the council had the unconditional power to "grant or refuse the application." *Id.* at 1573. The court determined that because the ordinance only provided guidelines as to which persons and places were *ineligible* for a license, there were no criteria establishing which persons and places were *eligible. See id.* at 1574. The court faulted this scheme because

> there [was] no provision in the ordinance requiring the city council to grant license applications for any person or place that is not rendered ineligible under [the ordinance]. Limits on discretion in licensing schemes must "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." Thus, the city may neither rely on claims of implied limits

108

nor ask the Court to write limits into a silent regulation.

*Id.* (quoting *City of Lakewood*, 486 U.S. at 770).

¶ 17. Unlike *Wolff*, the ordinance here has clear-cut standards for licensing. The applicant must not have violated any provision in the ordinance, including requirements pertaining to the physical layout of the establishment, the conduct of the patrons and the responsibilities of the employees and operator. While the ordinance does not contain a statement specifically requiring the granting of a license when the applicant is not rendered ineligible, the common council is not free to grant or deny applications at its whim. The ordinance's standards are plainly spelled out and are not contingent upon the type of "silent regulation" at play in *Wolff. See id.*

¶ 18. City News's reliance on *City of Lakewood* is also misplaced. There, the Supreme Court ruled unconstitutional a licensing ordinance that gave the mayor unbounded discretion to grant or deny applications and which merely required an explanation of the reasons for denial without the use of standards. *See City of Lakewood*, 486 U.S. at 769–72. *City of Lakewood* carries no weight here because the City's licensing scheme does set forth specific guidelines and expressly provides that a violation of such guidelines constitutes a ground for nonissuance or nonrenewal.

¶ 19. City News further contends that the ordinance is unconstitutionally vague and permits unbridled discretion because there are no rules defining the level of proof of findings under MUNICIPAL CODE § 8.195(4)(b)2, the provision barring licensure in the event an applicant is "found" to have previously violated the ordinance. City News claims that the ordinance must establish whether the finding is to be a

mere accusation, a municipal citation, a conviction in municipal court or a conviction in a court of record.

¶ 20. While the criteria for the common council's findings are clearly circumscribed by the ordinance, we agree that the scheme does not set forth levels of proof for the council's findings. However, City News cites no authority, and we can find none, that requires such direction. As the City points out, the common council is given the power "to act for the government . . . and for the health, safety, and welfare of the public, and may carry out its powers by license, regulation . . . and other necessary or convenient means." Section 62.11(5), STATS. Within the council's power is the authority to make its own findings. While licensing ordinances must include narrow and detailed standards, City News presents no case law indicating that such standards extend to the level of proof of the municipality's findings. We therefore conclude that City News has failed to rebut the presumption of the ordinance's constitutionality on this issue.

## 2. Inadequate Time Limits

¶ 21. City News contends that the City's licensing scheme is defective because it does not prescribe mandatory time limits for the application process. We disagree.

¶ 22. The City's licensing ordinance requires that a license renewal application be filed at least sixty days before the license is due to expire. *See* MUNICIPAL CODE § 8.195(7)(a). Within twenty-one days of the application's receipt, the City "shall notify the applicant whether the application is granted or denied."[5] *Id.*

---

[5] Although City News points out that the City did not give notice of its denial until thirty-five days after receipt of the

§ 8.195(3)(c). As part of the renewal process, "[i]f the City Police Department is aware of any information bearing on the operator's qualifications, that information shall be filed in writing with the City Clerk." *Id.* § 8.195(7)(c). In addition, "[t]he building inspector shall inspect the establishment prior to the renewal of a license to determine compliance with the provisions of this ordinance." *Id.* § 8.195(7)(d).

¶ 23. Despite the time sequence set forth above, City News contends that the filing of police information and the building inspection render the City's licensing scheme constitutionally defective because these conditions permit a delay in the application process beyond the prescribed time limits. While we agree that a licensing condition must place time limits on the issuance of the license, *see FW/PBS*, 493 U.S. at 226, we are not persuaded that the ordinance fails here.

¶ 24. In *FW/PBS*, the City of Dallas enacted a licensing scheme for sexually-oriented businesses giving the city police chief thirty days to accept a license application. *See id.* at 227. Issuance of the license was contingent upon a building inspection for which there was no mandated time period. *See id.* Because there was no time limitation on the inspection and because the ordinance provided no means for an applicant to ensure inspection within the thirty-day application period, the Court concluded that the scheme was unconstitutional. *See id.*

¶ 25. In contrast to *FW/PBS*, the building inspection and filing of police information here do not create a means for delaying the City's twenty-one day licensure period. First, while a building inspection is required, the ordinance provides that the inspection

---

application, this fact has no bearing on a facial challenge to the ordinance.

must occur "prior to the renewal of [the] license." MUNICIPAL CODE § 8.195(7)(d). The onus is on the building inspector to complete his or her inspection before the license is to be renewed. This provision does not compare to *FW/PBS* because the ordinance there simply stated that a license will not be issued if the premises "have not been approved by the health department, fire department, and the building official." *FW/PBS*, 493 U.S. at 227.

¶ 26. Second, MUNICIPAL CODE § 8.195(7)(c) provides that the filing of police information is to occur only if the police are "aware of any information bearing on the operator's qualifications." Unlike the building inspection, the filing of police information is not compulsory. This provision, therefore, does not stand in the way of the twenty-one day approval deadline because the submission of information is solely at the discretion of the police department. We conclude, therefore, that the City's ordinance does not permit delays in the twenty-one day application period.

### 3. Preserving the Status Quo

¶ 27. City News contends that the ordinance is defective because it fails to explicitly require preservation of the status quo pending judicial review of a license denial or revocation. We conclude that while the ordinance does not contain a status quo provision, such language is unnecessary. What is important is that the status quo is maintained by the operation of the licensing scheme. The ordinance here does just that.

¶ 28. *FW/PBS* instructs that "the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained." *FW/PBS*, 493 U.S. at 228. As illustrated above, the licensing scheme in this case

starts with a license renewal application deadline sixty days before the license's expiration date. Upon receipt of the application, the City then has twenty-one days to inform the applicant whether the application is accepted or denied. Through these provisions, a decision must be rendered at the very least thirty-nine days before the license is due to lapse. As the City points out, because the common council's review of an application is completed prior to expiration of the license, the status quo is automatically maintained. Therefore, because we do not read *FW/PBS* as requiring anything more than the effective preservation of the status quo during the period in which the licensor makes its decision, we conclude that the ordinance satisfies the constitutional safeguards.

### 4. Prompt Judicial Review

¶ 29. City News next asserts that the ordinance does not guarantee "prompt judicial review," as established by the Supreme Court in *Freedman.* The *Freedman* Court held that a licensing scheme must "assure a *prompt final judicial decision,* to minimize the deterrent effect of an interim and possibly erroneous denial of a license." *Id.* at 59 (emphasis added). "Any restraint imposed in advance of a *final judicial determination on the merits* must . . . be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." *Id.* (emphasis added).

¶ 30. While the *Freedman* Court apparently contemplated timely issuance of a final "decision" or "determination," more recently in *FW/PBS* the Court appears to have relaxed this requirement by emphasizing the "possibility" and "availability" of prompt

113

judicial review. Justice O'Connor[6] wrote that "expeditious judicial review of that decision must be *available*" and that "there must be the *possibility* of prompt judicial review in the event that the license is erroneously denied." *FW/PBS*, 493 U.S. at 227, 228 (emphasis added). In his concurrence to *FW/PBS*, Justice Brennan, the author of the *Freedman* opinion, also stated that "a prompt judicial determination must be *available.*" *FW/PBS*, 493 U.S. at 239 (emphasis added). While we note this change in the Court's language, we also acknowledge that the Court has yet to squarely define the parameters of "prompt judicial review."

¶ 31. Since *FW/PBS*, federal courts of appeal have been divided on the issue of "prompt judicial review." The Fourth, Sixth and Ninth Circuits hold the view that "prompt judicial review" means a timely judicial determination on the merits. *See Baby Tam & Co. v. City of Las Vegas*, 154 F.3d 1097, 1101–02 (9th Cir. 1998); *11126 Baltimore Blvd., Inc. v. Prince George's County*, 58 F.3d 988, 998–1001 (4th Cir. 1995) (en banc); *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 225 (6th Cir. 1995).[7] These courts have reasoned that because a person always has a judicial

---

[6] Although the Court in *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), was split (three-way) as to which, if any, of the *Freedman* procedural safeguards applied, a majority of the justices agreed that (1) the licensor should make its decision within a specified and reasonable time period during which the status quo is maintained and (2) a licensing scheme must guarantee prompt judicial review. *See FW/PBS*, 493 U.S. at 227, 239.

[7] Like the Fourth, Sixth and Ninth Circuits, the Eleventh Circuit has rejected the view that mere access to judicial review is sufficient, but it has not stated what more is required to satisfy the "prompt judicial review" standard. *See Redner v. Dean*, 29 F.3d 1495, 1501–02 (11th Cir. 1994).

forum available when his or her speech is allegedly encroached, "to hold that mere access to judicial review fulfills [*Freedman*'s prompt review requirement] makes the safeguard itself meaningless." *Baby Tam*, 154 F.3d at 1101.

¶ 32. In the First, Fifth and Seventh Circuits, the courts have taken the alternative approach that prompt *access* to judicial review qualifies as "prompt judicial review." *See TK's Video, Inc. v. Denton County*, 24 F.3d 705, 709 (5th Cir. 1994); *Graff v. City of Chicago*, 9 F.3d 1309, 1324–25 (7th Cir. 1993) (en banc); *Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth.*, 984 F.2d 1319, 1327 (1st Cir. 1993). In *Graff*, the court concluded that a newsstand ordinance that did not specifically mention judicial review was nonetheless constitutional because access to judicial review was afforded by means of the common law writ of certiorari. *See Graff*, 9 F.3d at 1324–25.

¶ 33. Because we believe that a municipality does not have the authority to direct a state judicial court to issue a decision within a specified period of time, we are inclined to follow the reasoning of the First, Fifth and Seventh Circuits and the precise language of Justice O'Connor's opinion in *FW/PBS* that prompt access or availability of judicial review satisfies First Amendment protections. *See FW/PBS*, 493 U.S. at 227. As the court explained in *TK's Video*, 24 F.3d at 709, "the state must offer a fair opportunity to complete the administrative process and access the courts within a brief period. A 'brief period' within which all judicial avenues are exhausted would be an oxymoron." While a local governing body can pass an ordinance directing judicial review within a short period of time, we doubt that it can also require a court to make a complete and final judicial review on the merits within

a specified time period. We therefore conclude that the City's ordinance will be upheld as long as expeditious judicial review is available.

¶ 34. Here, the licensing scheme satisfies the prompt judicial review standard. MUNICIPAL CODE § 2.11(1) provides that administrative review of a municipality's determination is to be addressed by ch. 68, STATS.:[8]

> To insure fair play and due process in the adminis-tration of the affairs, ordinances, resolutions and bylaws of the City, the Council hereby declares that the provisions of Ch. 68, Wis. Stats., relating to municipal administrative review procedure shall be in full force and effect in the City . . . .

Under ch. 68, an aggrieved party has thirty days in which to seek review of an initial determination before the municipal authority making the determination. *See* § 68.08, STATS. The municipal authority then has fifteen days to conduct its review. *See* § 68.09(3), STATS. Once the municipality issues its decision, the person aggrieved may then appeal; the appeal is taken within thirty days of the issuance of the decision. *See* § 68.10(1), (2), STATS. The municipality must provide a hearing to the appellant within fifteen days of receipt of the notice of appeal. *See* § 68.11(1), STATS. After the hearing is held, the reviewing body has twenty days to make its final determination. *See* § 68.12(1), STATS. The appellant may then seek judicial review by certiorari within thirty days of receipt of the final determination. *See* § 68.13, STATS.

---

[8] CITY OF WAUKESHA, WIS., MUNICIPAL CODE § 8.195(11) (1995) also states that state law governs the administrative procedure and judicial review of a license renewal case.

¶ 35. The ch. 68, STATS., framework for review provides a fixed timetable from the time of the municipal authority's initial determination to the date of the administrative review appeals board's decision. Contrary to City News's assertion, judicial review may not be delayed for an indefinite period of time, as was the case in *Redner v. Dean*, 29 F.3d 1495, 1502 (11th Cir. 1994). There, the licensing scheme was struck down because it stated (1) that an applicant "may" begin operating its establishment "unless and until the County Administrator notifies the applicant of a denial of the application," and (2) that an appeal will be heard "as soon as the Board's calendar will allow." *Id.* at 1500–01. Unlike *Redner*, however, ch. 68 does not contain contingencies that leave an applicant at the mercy of the licensor's discretion.

¶ 36. Perhaps more importantly, once the administrative review appeals board has issued its final determination, *see* § 68.12(1), STATS., an appellant may obtain *immediate* judicial review. Review by certiorari must be filed within thirty days of receipt of the final determination. *See* § 68.13(1), STATS. We conclude that because the ch. 68, STATS., timetable provides prompt access to judicial review, the dictates of *FW/PBS* are satisfied. *See FW/PBS*, 493 U.S. at 227.

### 5. *Public Hearing Provision*

¶ 37. City News further argues that an indefinite time period is created as to the public hearing set forth under MUNICIPAL CODE § 8.195(3)(d). This provision states:

> Whenever an application is denied, the City Clerk shall advise the applicant in writing of the reasons for such action. If the applicant requests a hearing within 10 days of receipt of notification of

denial, a public hearing shall be held within 10 days thereafter before the Council or its designated committee as hereinafter provided.

While § 8.195(3)(d) provides a ten-day period in which a hearing will be held to review the common council's initial determination, there is no language addressing what is to take place following the hearing. And although the provision concludes that the public hearing shall be held "as hereinafter provided," *id.*, there is no further explanation within § 8.195.

¶ 38. The City responds that City News is precluded from raising this argument because it failed to pursue the public hearing and instead sought alternative means of review under ch. 68, STATS. This response must fail, however, because City News has brought a facial challenge alleging invalid prior restraints contrary to the First Amendment and such a challenge may be raised regardless of the recourse City News has pursued. *See Brandmiller v. Arreola*, 199 Wis. 2d 528, 546–47, 544 N.W.2d 894, 902 (1996) ("[I]n asserting an overbreadth challenge an individual may hypothesize situations in which a statute or ordinance would unconstitutionally intrude upon First Amendment rights of third parties."). City News, moreover, has standing to contest this provision because

> [i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.

*Freedman*, 380 U.S. at 56.

¶ 39. We agree with City News that MUNICIPAL CODE § 8.195(3)(d) creates a risk of an indefinite delay by putting an applicant at the mercy of the licensing body. While the applicant may receive a public hearing within ten days, the common council is given no direction as to what it must do following the hearing or when it must presumably take action in response to the hearing. If a decision is to follow, there are no guidelines providing when such a decision must be issued. Therefore, we conclude, consistent with *Redner*, that the public hearing provision within § 8.195(3)(d) is unconstitutionally deficient. *See Redner*, 29 F.3d at 1502.

¶ 40. We are not convinced, however, that the entire ordinance must fail. A court may sever the unconstitutional portions of a statute or an ordinance to leave intact the remainder of the legislation. *See State v. Janssen*, 219 Wis. 2d 362, 378–79, 580 N.W.2d 260, 267 (1998). "Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent, but the presumption is in favor of severability." *Id.* at 379, 580 N.W.2d at 267 (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984)).

¶ 41. As a rule of statutory construction, severability is codified under § 990.001(11), STATS., which states:

> The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be

given effect without the invalid provision or application.

¶ 42. In *City of Madison v. Nickel*, 66 Wis. 2d 71, 223 N.W.2d 865 (1974), our supreme court saved an obscenity ordinance by severing a portion of it that provided an unconstitutional definition of obscenity. *See id.* at 80, 223 N.W.2d at 870; *see also State v. Zarnke*, 224 Wis. 2d 116, 135–37, 589 N.W.2d 370, 377–78 (1999). In determining whether a defective section of an ordinance fatally infects the remainder of the law, a court should look to the legislative intent, particularly whether "the legislature would be presumed to have enacted the valid portion without the invalid [portion]." *Nickel*, 66 Wis. 2d at 79, 223 N.W.2d at 869 (quoted source omitted). If a statute contains distinct parts and the offending parts can be extracted while leaving intact a "living, complete law capable of being carried into effect . . . the valid portions must stand." *Id.* at 79–80, 223 N.W.2d at 870 (quoted source omitted). Additional consideration is given to whether the ordinance contains a severability clause.

¶ 43. Although the ordinance in this case does not contain an express severability clause, the "severability intention" of the common council can be gleaned from the purpose and structure of the ordinance. *See Denver Area Educ. Telecomms. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 767 (1996) (where the Cable Television Consumer Protection and Competition Act did not contain a severability clause, the Court looked to its purpose and structure to decipher the legislature's intent). The common council has clearly expressed its objective in creating the adult establishment licensing ordinance:

> WHEREAS, although the provisions of this ordinance have neither the purpose or effect of imposing a limitation or restriction on the content of any communicative materials, the Common Council deems it to be in the interests of the City of Waukesha to provide for licensing and regulation of adult oriented establishments . . . to combat and curb the secondary effects of such establishments.

MUNICIPAL CODE § 8.195 preamble. While there is no stated purpose regarding the methods of administrative review, we fail to see how severance of the public hearing provision would undermine the overriding goal of regulating adult establishments. *Cf. Katt v. Village of Sturtevant*, 269 Wis. 638, 642, 70 N.W.2d 188, 190 (1955) (where intention of village board could not be carried out by severing one provision, the whole ordinance was void).

¶ 44. Although MUNICIPAL CODE § 8.195(3)(d) may offer an aggrieved applicant an avenue for administrative review, the primary method of review lies under ch. 68, STATS. As the common council has provided under § 8.195(11) ("Administrative Review Procedure"),

> The City ordinances and State law shall govern the administrative procedure and review regarding the granting, denial, renewal, nonrenewal, revocation or suspension of a license.

In addition, § 2.11(1) of the MUNICIPAL CODE specifically declares that ch. 68 is controlling for purposes of administrative review. As we have already determined, ch. 68 sets forth narrow, definite and objective standards for bringing an appeal, and City News does not directly challenge this chapter.

¶ 45. Based on the purpose and structure of the ordinance, we are certain that the common council would have still enacted the ordinance even without the public hearing provision. Therefore, because we conclude that severance of the invalid provision leaves intact an otherwise complete licensing scheme, we refuse to strike the entire ordinance.

## B. Due Process Considerations

### 1. *Impartial Decision Maker*

¶ 46. City News claims that it was deprived of an impartial decision maker when Mayor Carol Opel presided over both the common council's initial determination and the administrative review appeals board's subsequent administrative review.[9] We are not persuaded.

¶ 47. Due process protections, including the right to an impartial decision maker, extend to common council proceedings. *See State ex rel. DeLuca v. Common Council*, 72 Wis. 2d 672, 677, 679, 242 N.W.2d 689, 692, 693 (1976). These protections have been adopted under ch. 68, STATS., which guarantees an appellant the right to a hearing on administrative appeal following the municipality's initial determination. *See* §§ 68.10(1)(a), 68.11(1), STATS.[10] Section 68.11(2) states that for purposes of the administrative hearing, the

---

[9] The administrative review appeals board is established under CITY OF WAUKESHA, WIS., MUNICIPAL CODE, § 2.11(3) (1995).

[10] An appellant, however, is not granted a hearing on administrative appeal "[i]f the person aggrieved had a hearing substantially in compliance with s. 68.11 when the initial determination was made." Section 68.10(1)(b), STATS.

122

municipality must provide "an impartial decision maker, who may be an officer, committee, board, commission or the governing body who did not participate in making or reviewing the initial determination, who shall make the decision on administrative appeal."

¶ 48. The city mayor is directed to preside over common council meetings. *See* § 62.09(8)(b), STATS. In this case, the mayor was present for council meetings addressing City News's license application. The mayor also signed the council's December 19, 1995 resolution denying City News's license application. Later, when the administrative review appeals board conducted its § 68.09, STATS., review, the mayor was one of three individuals who decided to uphold the common council's resolution. City News now argues that because the mayor is the chief executive officer of Waukesha and is entrusted with the power to veto all acts of the common council, *see* § 62.09(8)(a) and (c), she thereby "participate[d] in making or reviewing the initial determination," § 68.11(2), STATS., by presiding over the council and signing the December 19 resolution. City News claims that by approving the resolution and, in turn, choosing not to exercise her veto power, the mayor disqualified herself as an "impartial decision maker."

¶ 49. *DeLuca* is instructive on this issue. There, the court explained that due process protections extend both to the bias and the appearance of bias of the decision maker. "Circumstances which lead to a high probability of bias, even though no actual bias is revealed in the record, may be sufficient to give the proceedings an unacceptable constitutional taint." *DeLuca*, 72 Wis. 2d at 684, 242 N.W.2d at 695. Following *Withrow v. Larkin*, 421 U.S. 35 (1975), the court

recognized two circumstances that show "such a high probability of actual bias as to be constitutionally intolerable." *DeLuca*, 72 Wis. 2d at 684, 242 N.W.2d at 695. The first situation presents itself when the decision maker has a financial interest at stake; the second occurs when the adjudicator has been subject to "personal abuse or criticism" from the party before it. *See id.*

¶ 50. In the present case, there is no indication that the mayor was influenced by impending financial interests in the outcome of the proceedings or had been the target of any personal abuse from City News. In addition, during the administrative review hearings, the mayor stated that

> I, too[,] believe that I can be an impartial hearer of this testimony. While I have chaired all the common council meetings, I act as a facilitator. I have not offered testimony or debate or spoke to the issue before the council at any time.

These statements support the conclusion that the mayor did not play a role in the decision-making process, and City News has not presented any evidence suggesting that the mayor did more than facilitate the common council's meetings. We agree with the City that under the circumstances the mayor's signature was a purely administrative act and was not indicative of her position on the merits of the dispute. Although the mayor had the power to veto the council's resolution, this discretion did not constitute review of the resolution. Therefore, because we are persuaded that the mayor did not participate in making or reviewing the resolution, we conclude that she was not disqualified from her subsequent participation in the administrative review proceedings.

## 2. *Adequate Notice*

¶ 51. City News next raises several arguments alleging a lack of sufficient notice as to the charges against it. As it points out, it has a property interest in the renewal of its operating license. *See Manos v. City of Green Bay*, 372 F. Supp. 40, 48–49 (E.D. Wis. 1974) (property interest was found for retention of liquor license). Such a property interest warrants the minimal safeguards of procedural due process. *See id.* at 49. These basic guarantees include providing notice of the charges upon which the license denial was based and giving an opportunity to challenge the charges. *See id.* at 51.

¶ 52. City News claims that following the issuance of the City's resolution, the City exceeded the scope of the allegations contained therein when it presented testimony from T.M., and related exhibits, at the administrative review hearing.[11] We are not persuaded.

¶ 53. T.M. testified that he was seventeen years old when he entered City News on March 7, 1996, and stole adult magazines. At the administrative hearing, City News objected to T.M.'s testimony because it had not received notice that the City was going to call T.M. and his actions were not mentioned in the December 19, 1995 resolution because the March 7 incident

---

[11] City News also complains that testimony about Jamie Bahr, including Exhibits 36 and 37, should not have been presented because this evidence went beyond the scope of the December 19 resolution. While we understand that the evidence about Bahr concerns a citation for displaying sexual material to minors, City News does not explain, and we cannot readily determine, the substance of the testimony. We therefore decline to address the issue. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633, 642 (Ct. App. 1992).

occurred after the common council had issued the resolution. The City responded that T.M.'s testimony was offered to impeach the prior testimony of City News employee David Hull concerning City News's personal identification policy and the fact that Hull had been issued a citation for permitting a minor to loiter on its premises. The administrative review appeals board noted City News's objection but nonetheless permitted T.M. to testify.[12]

¶ 54. We agree with the City. T.M.'s testimony was not used as a new ground for rejecting City News's license application. Rather, it was brought for the purpose of impeaching Hull's testimony that he abided by the store's policy of checking the identification of every person who appeared younger than thirty years of age. City News admitted as much in its proposed findings of fact for the administrative review appeals board where it stated, "[W]e find that [T.M.'s] testimony is not credible and is not sufficient to rebut the testimony of David Hull, the purpose for which it was offered." The administrative review appeals board's findings are also telling. There, the board relies upon the testimony of police officers who observed minors loitering on City News's premises and patrons engaging in sexual activity, and upon a building inspector's report regarding the size of the viewing booths. There is no mention, however, of T.M. We conclude, therefore, that the admission of T.M.'s testimony did not implicate due process protections.

¶ 55. Next, City News complains that it was denied adequate notice of a November 7, 1995 open booth violation that was raised at the administrative

_____

[12] The administrative review appeals board explained that it was its policy to note all objections but to nonetheless receive the evidence and determine its weight upon deliberation.

review hearing but not cited in the December 19 resolution. The resolution cited three open booth violations for which City News's operator received ordinance citations and was subsequently convicted. The resolution states:

> · WHEREAS, on 11/30/94, 12/1/94 and 12/2/94 City News and Novelty, Inc. through its employees and/or agents violated the provisions of section · 8.195(9)(b)2 of the Waukesha Municipal Code by failing to have every booth, room or cubicle totally open to a public lighted aisle so [as to] permit[ ] an unobstructed view at all times of anyone occupying the same.

During the administrative review, however, city building inspector Marvis Lemke reported that while City News's booths had violated the open booth ordinance upon his annual inspection on November 7, by November 30 the booth entrances had been reopened to an acceptable level. In the administrative review appeals board's findings, the board included Lemke's November 7 inspection report and mentioned the three ordinance violations. City News now claims that it had no notice of the November 7 open booth violation.

¶ 56. City News was provided sufficient notice to defend against the November 7 booth violation. First, MUNICIPAL CODE § 8.195(7)(d) advises that "[t]he building inspector shall inspect the establishment prior to the renewal of a license to determine compliance with the provisions of this ordinance." City News therefore had notice that an inspection would be made before its license would be renewed. Second, City News does not deny that it received citations for and was convicted of open booth violations occurring on November 30 and December 1 and 2, 1994. The December 19 resolution cited these violations. Third, the basis of all of the open

booth violations was the same—City News's use of wood paneling to narrow the booth openings, thereby creating an obstructed view of the booths.

### 3. Sanctions Imposed

¶ 57. City News next raises the issue of whether the City's response to its alleged violations of the ordinance, which was to invoke the most severe form of sanction and deny renewal of the license, passes constitutional muster. City News claims that the City acted unreasonably in "saving up" all of its complaints past the point where City News could effectively remedy them prior to renewal. City News argues that by utilizing a "sub rosa theory of strict liability without ever articulating it as such," the City has offended procedural due process requirements.

¶ 58. The City responds that the issue of whether it may deny a license renewal application rather than issue a license suspension or revocation is solely a matter of discretion for the licensing body. It asserts that there is no licensing requirement that it first provide a warning, a suspension or some lesser penalty before nonrenewal is appropriate. It adds that City News has failed to cite any authority addressing the issue of the appropriateness of particular sanctions sought by a municipality based upon ordinance violations.

¶ 59. We agree with the City that there is no authority requiring a municipality to pursue a lesser sanction or the least restrictive sanction in the event of an ordinance violation. There are, however, particular procedural due process considerations at play. These include providing notice of the charges, an opportunity to respond to and challenge the charges, an opportunity to present witnesses, and an opportunity to confront and cross-examine opposing witnesses. *See*

*Manos,* 372 F. Supp. at 51. In this case, we have already determined that City News was provided adequate notice of the charges. In addition, there is no dispute that it was afforded an opportunity to challenge the charges.

¶ 60. We next consider the particular types of sanctions available when an operator violates the ordinance. First, there is nonissuance and nonrenewal of a license. This measure is conditioned upon an applicant having violated a provision of the licensing scheme within five years of the application. Second, revocation of a license for one year is similarly available where "[t]he operator or any employee of the operator violates any provision of this section or any rules or regulation adopted by the Council pursuant to this section." MUNICIPAL CODE § 8.195(8)(a)2. Finally, a suspension of thirty days or less may be invoked "in the case of a first offense by an operator where the conduct was solely that of an employee . . . if the Council shall find that the operator had no actual or constructive knowledge of such violation and could not by the exercise of due diligence have had such actual or constructive knowledge." *Id.*

¶ 61. Suspension is inappropriate here because the board specifically found that a director of City News had committed various violations of the ordinance. According to the board's June 28, 1996 findings, Police Officer Richard Piagentini observed a minor patron on City News's premises on December 24, 1994, and City News director Daniel Bishop was subsequently convicted for permitting the minor on the premises contrary to MUNICIPAL CODE § 8.195(10)(c). The findings indicate that Bishop also received convictions for three other ordinance violations based on City News's failure to maintain open viewing booths pursu-

ant to § 8.195(9)(b)2. Therefore, because a director of City News was found to have contravened the ordinance, we attribute knowledge of the violations to City News. We further note that the violations cited by the board were not solely at the hands of an employee. Thus, suspension is not an available sanction in this case.

¶ 62. While revocation and nonrenewal both rely upon a violation of the ordinance, we believe the City properly exercised its discretion in deciding to impose a nonrenewal sanction. In its findings, the board listed nine separate ordinance violations occurring within a one-year period. Four of these involved minors loitering on the premises, three involved open booth violations and two dealt with customers masturbating in viewing booths. In its preamble, the ordinance speaks to particular health and safety concerns endemic to adult-oriented establishments. Such concerns include the transmission of AIDS and other sexually transmitted diseases and increased levels of criminal activity such as prostitution, rape and assaults. Considering both the health and safety issues as well as City News's record of ordinance violations, we are satisfied that the City acted within its discretion.

## C. Sufficiency of Nonrenewal Grounds

¶ 63. Finally, City News asserts that the grounds upon which the nonrenewal determination was based were inadequate as a matter of law. It claims that citations issued to patrons in February and March 1995 for lewd and lascivious conduct cannot stand as a

130

basis for nonrenewal.[13] City News further argues that because the standards for issuance of a new license concern only the conduct of officers, directors and stockholders of the corporation,[14] the conduct of patrons is immaterial. City News is wrong.

¶ 64. As we have previously outlined, the ordinance contains specific restrictions under subsecs. (9) and (10) that stand apart from the general licensure standards under MUNICIPAL CODE § 8.195(4)(b). One such requirement is that no occupants of booths, rooms or cubicles shall engage in any type of sexual activity. *See id.* § 8.195(9)(c). At the end of the licensing scheme, the ordinance states generally that "[t]he operator shall insure compliance of the establishment and its *patrons* with the provisions of this section." *Id.* 8.195(10)(f) (emphasis added). "Operator" is defined as any "person, partnership, or corporation operating,

---

[13] The administrative review appeals board's findings were, in pertinent part, as follows:

> 1. On February 28, 1995, Officer John Gibbs observed a patron of City News and Novelty, Inc. . . . masturbating in a viewing booth. . . . There were no employees in the booth area when the Officer made his observation. The patron was convicted of the criminal charge of lewd and lascivious conduct contrary to Section 944.20, Wis. Stats. . . .

> 2. On March 11, 1995, Officer Paul De Jarlais observed a patron at City News . . . masturbating in a viewing booth. There were no employees in the booth area when the Officer made his observation. The patron was convicted of the criminal charge of lewd and lascivious conduct contrary to Section 944.20, Wis. Stats. . . .

[14] MUNICIPAL CODE § 8.195(4)(b)2 provides, "No officer, director, or stockholder required to be named under par. (3)(b) shall have been found to have previously violated this section within 5 years immediately preceding the date of the application."

conducting, maintaining or owning any adult-oriented establishment." *Id.* § 8.195(1).

¶ 65. It is clear from the ordinance that City · News is the operator here and that when patrons were issued citations for and convicted of lewd and lascivious behavior, City News violated the ordinance by not ensuring compliance with the para. (9)(c) prohibition on sexual activity. A plain reading of the ordinance does not limit the City's review to only the conduct of officers, directors and stockholders. If it did, then the conduct of employees, including permitting the exposure of sexual material to minors, would be of no consequence. City News's position, therefore, contravenes the explicit condition that actions of "any employee constituting a violation of the provisions of this section" are imputed to the operator for purposes of determining revocation, suspension or renewal. *See id.* § 8.195(10)(b). We reject this narrow reading of the ordinance.

¶ 66. City News next asserts that the testimony of police officers that minors had been found loitering in the store on three separate occasions[15] was insuffi-

---

[15] The administrative review appeals board's findings stated the following:

> 2. On July 23, 1995, Officer John Konkol observed S.S., a patron, at City News . . . who was a minor. Officer Konkol made the observation while on duty. Additionally, S.S. testified that she was a patron at City News . . . on July 23, 1995 and . . . was a minor. Christopher Alverson, the employee on duty at the time, was convicted of a civil ordinance violation contrary to Section 8.195, Subsection 8.195(10)(c) of the Municipal Code of Waukesha on August 25, 1995. There was no evidence to refute the credible testimony of Officer Konkol or S.S.

> 3. On October 18, 1995, Officer Mark Howard observed S.D., a patron, at City News . . . who was a minor. Officer Howard made

cient evidence as a matter of law to qualify as a "finding," as this concept is used within the licensing ordinance. *See id.* § 8.195(4)(b)2 ("[N]o officer, director, or stockholder . . . shall have been *found* to have previously violated this section . . . ."). (Emphasis added.) In reviewing the board's findings, we apply the substantial evidence test to determine whether the evidence is sufficient. *See Clark v. Waupaca County Bd. of Adjustment*, 186 Wis. 2d 300, 304, 519 N.W.2d 782, 784 (Ct. App. 1994). Substantial evidence is evidence of such convincing power that reasonable persons could reach the same decision as the board. *See id.* The substantial evidence test is highly deferential and we may not substitute our view of the evidence for that of the board. *See id.*

¶ 67. We conclude that substantial evidence supported the board's findings. At the administrative hearings, a police officer testified to each of the three incidents involving minors. Each observation made by the officers took place while the officer was on duty. For two of these incidents, the minor involved testified to

the observation during the course of a routine investigation. Additionally, S.D. testified that he was a patron of City News . . . on October 18, 1995 and . . . was a minor. There was no evidence to refute the credible testimony of Officer Howard and S.D.

4. On November 29, 1995, Officer Paul Paikowski observed a patron of City News . . . who was a minor. Officer Paikowski made these observations as a result of a routine inspection of the premises. He was not called to the scene by an employee of City News . . . . There was no evidence to refute the credible testimony of Officer Paikowski.

Because the July 23 incident led to a conviction, City News is wrong in stating that it "has never been convicted, even in municipal court, of these violations." City News is otherwise correct that the October 18 and November 29 incidents did not result in convictions.

his or her conduct. This evidence was substantial and City News has failed to present any evidence to refute the testimony of the officers or the minor patrons.

¶ 68. Finally, City News seeks to refute evidence of a fourth incident involving a minor loitering on its premises. At the administrative hearings, an officer testified that while on patrol he observed a minor at City News on December 24, 1994. The board's findings indicate that an employee and a director of City News were convicted of civil ordinance violations for this incident. City News now contends that because these convictions were later dismissed on appeal and because a conviction must stand to qualify as a finding of the board, this incident carries no weight in support of the board's decision. We disagree.

¶ 69. First, City News provides no authority to support its view that only a conviction can constitute a finding of the board. Contrary to this position, the board has the discretion to make its own findings of fact based on the evidence presented. As was the case with the July 23, October 18 and November 29, 1995 incidents involving minors, an officer testified that he observed a minor patron on City News's premises. This evidence was not refuted by City News, and while the convictions of the employee and director were dismissed, the board was still justified in relying on the evidence presented at the hearings. Because we conclude that the board's findings are supported by a reasonable view of the evidence, *see Snyder v. Waukesha County Zoning Bd. of Adjustment*, 74 Wis. 2d 468, 476, 247 N.W.2d 98, 103 (1976), City News's argument is without merit.

## CONCLUSION

¶ 70. While City News's due process and sufficiency of the evidence challenges fail, we agree that the public hearing provision under § 8.195(3)(d) of the MUNICIPAL CODE is constitutionally deficient. However, rather than striking the entire ordinance, we conclude that § 8.195(3)(d) is severable and thus reverse as to this provision and affirm as to the remainder.

Costs are denied to both parties.

*By the Court.*—Judgment affirmed in part and reversed in part.